THE CHICAGO UNION TRACTION COMPANY

*v.*

LODAVINE MILLER.

*Opinion filed October 24, 1904.*

1. INSTRUCTIONS—*instructions should be accurate if the facts are calculated to excite sympathy.* In actions sounding purely in damages, if the evidence is conflicting and the facts calculated to excite sympathy, the instructions to the jury must be clear, accurate and concise.

2. SAME—*when instruction as to damages is misleading.* An instruction in a personal injury suit is misleading which authorizes the jury, in estimating the damages, to take into consideration the "present physical condition of the plaintiff as shown by the evidence," without requiring that such condition be found to be the result of the injury.

3. TRIAL—*great latitude should be allowed in cross-examination if the plaintiff's symptoms may be feigned.* Wide latitude in cross-examination of the plaintiff in a personal injury case should be allowed where the extent of her disabilities is in dispute and the character thereof such that the symptoms may be feigned.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. ELBRIDGE HANECY, Judge, presiding.

JOHN A. ROSE, (W. W. GURLEY, of counsel,) for appellant.

J. MARION MILLER, WILLIAM ELMORE FOSTER, and JOHN C. STETSON, for appellee.

212—4

Mr. JUSTICE SCOTT delivered the opinion of the court:

Appellee recovered a judgment on January 31, 1903, in the circuit court of Cook county, for $12,500 against appellant, in a suit of trespass on the case, brought to recover damages resulting from a personal injury received while a passenger on the street railway of appellant, in the city of Chicago. On appeal, the Appellate Court for the First District required the appellee to enter a *remittitur* of $4500, and upon her compliance with that requirement affirmed the judgment for $8000, and the case comes here by further appeal.

The errors assigned question the action of the court in giving the first instruction asked by appellee and in refusing to allow appellee to answer a question propounded to her on cross-examination.

The principal question in the case is as to the character and extent of the injuries received by appellee. Appellant sought to show that her health was not good prior to the accident, that the injury received by her was much less serious than claimed by her, and that she had entirely recovered from the effects thereof.

On the evening of July 15, 1901, appellee was riding in an open car on the street railway of appellant. While traveling at a very high rate of speed, the car was stopped suddenly, and she was dashed violently forward, and contends that she received an injury to her spine and spinal cord from which she has never recovered. She was taken from the car to a near-by drug store, from there to the office of Dr. Clemens Venn, and from his office, on the same evening, she was taken home in a carriage. At the time of the injury she was thirty-two years of age and was employed as a stenographer in Kinsley's restaurant, in Chicago, and received $11 per week and her meals for her services.

She testified that prior to this time, her health had always been good, except that on one occasion, several years before, she was in a hospital for a short time taking treatment for what she described as "a run-down condition;"

that at the time she was in the hospital she was residing in a building known as the Potomac Apartment Building with her husband, Charles S. Kueter; that later she obtained a divorce from him and resumed her maiden name; that after the accident she suffered great pain in the abdomen, in the spine and in the small of the back; that she was confined to her bed for about three weeks and then left the city and went to Neoga, Illinois, a distance of about one hundred and fifty miles, where she remained about three weeks visiting and then returned to Chicago; that a few days after receiving the injury she discharged Dr. Venn and employed Dr. Edwin Cross, who fitted her with appliances to brace and strengthen her back; that these consisted of a splint, a so-called jury-mast and straps for the shoulders and a bandage around the body. She testified that she has worn the bandage continuously since, but that she dispensed with the other appliances a few weeks after receiving the injury. That in February, 1902, she went to her brother's home in the city of Chicago to take care of his little child, about ten months old; on that day she had removed the bandage and she strained her back in carrying the baby around; and succeeding this she was quite ill and was confined to her bed for about two weeks; that since the accident in July, 1901, she has had very little strength and cannot walk any distance on account of her back being weak; that she cannot reach down, and cannot walk without support, is troubled with sleeplessness, cannot sit very long at a time without twitching, and cannot lie on her back at all; she is startled by unusual sounds, suffers great pain in the back and side, and walking about makes her nervous; that she cannot bear anything touching the spine, and when anyone touches her it almost throws her into a spasm, and that she has not been able to hold a child in her arms since February, 1902.

It appears from the testimony of Dr. Cross that he had been treating Miss Miller since about three days after the accident; that he regarded her difficulty as resulting from

an injury to the spinal column and spinal cord; that in addition to the trouble with her back, she had some stomach and bowel trouble also, incident to the injury to the spinal cord. He diagnosed her case as a congestion and contusion or bruise of the spinal cord.

Dr. Venn, who first treated her, testified in substance that during the few days he treated her he found no indications of bruises or contusions or injuries of any kind to the spinal column or spinal cord, and that there was no indication at that time of any spinal or nervous trouble; that the injury of which she complained principally at that time was severe tenderness of the abdomen and lower part of the lungs and stomach; that she sat up in bed, propped up with pillows, on the second or third day after the accident.

Bessie Gray testified that she was employed at Kinsley's as assistant book-keeper with Miss Miller prior to the accident; that Miss Miller then complained of her physical condition and especially that she had a weak back.

John Stream testified that he was janitor of the Potomac Apartment Building, in Chicago, when Miss Miller lived there with her husband, Charles S. Kueter, several years prior to the accident; that she appeared to be delicate; that she walked around the house very slowly; and when he would inquire in reference to her health she would usually express herself as not feeling very well.

Ida Peterson testified that she worked for appellee as a domestic when she resided in the Potomac Building and that appellee was always complaining about her back and sometimes felt very bad; that at such times she got about the house slower than at other times, but without any help.

Ellen G. Roberts, an attorney at law, testified that some time in May, 1901, she had a conversation with Miss Miller in which the latter stated that she was feeling better than she had for some time, but that she had never been strong; that on the third day of August, 1901, which would be nineteen days after the accident, she saw appellee getting out of a

carriage at the entrance of the Lakeside Building in Chicago; that Miss Miller took what the witness thought were straps from her shoulders and left them on the seat of the carriage; that appellee got out of the carriage and went into the building unassisted; that later the witness was in the office of a physician in that building and saw Miss Miller there and heard a portion of a conversation that passed between her and the physician while they were in another room than that in which the witness was; that Miss Miller stated to the physician that she was very well and never felt better in her life, and wanted him to see a man by the name of Weaver for the purpose of assisting her in getting her position back; that if she could get the position again she would go to work right away; that she had left her braces in the carriage, and said, "The detectives from the company are watching me and you know I must get big damages. I must keep up appearances;" that Miss Miller stated that she was going to Neely or Neoga for a visit and wanted her whereabouts kept secret because she didn't want to be watched or didn't want to be bothered or annoyed by people following her; that witness saw her and had a conversation with her after her return to the city, and Miss Miller then said that she had gained about ten pounds and felt very well.

Ever since the accident and for some time prior thereto, appellee has lived at a boarding house kept by Miss Cora Gee. Laura Olson, a domestic, testified that she was employed at the Gee house from May until October in the year 1902; that Miss Miller assisted during that time in the performance of household duties; that among other things she helped in canning fruit; that there were from twelve to fifteen boarders in the house and that Miss Miller "generally baked the pies and cakes and made the pastry," and usually prepared the noon lunch for the family, none of the boarders other than Miss Miller being at the house for that meal.

Caroline Stofft and her daughter, Lillian Stofft, testified that they had occasionally called on Mrs. Willis, who also

boarded at Miss Gee's, and had seen appellee there; that she appeared to be in good health, had good color in her cheeks, stood erect, stepped quickly and walked without assistance; that particularly on the evening before the evidence of these two women was taken they saw her come up a long flight of stairs at the Gee house and walk down the hallway without assistance.

Helen Schram testified that she had called at the Gee home occasionally during the year 1902, and usually saw Miss Miller, who frequently opened the door to admit her when she came; that while appellee appeared delicate, she walked erect, without assistance, and went up the stairway unassisted.

Carrie Willis testified that she was employed by appellant to go to the Gee house and board there for the purpose of observing the movements and mode of living of appellee. She testified that appellee did many things which the latter, on her examination, stated she was unable to do. It is unnecessary to set her testimony out in detail, but among other things, she recounted a tiresome shopping excursion taken by herself and Miss Miller in June, 1902. They left home at 11 A. M. and returned about 5 P. M., and visited five different stores in Chicago. During the time they were visiting the stores they were on their feet almost continually. Miss Miller walked from store to store without assistance and seemed like a well person. Mrs. Willis also testified that during the months of July and August, 1902, she took five photographs of Miss Miller, which were offered in evidence. In one of these she is shown standing erect, unsupported, and holding a child in her arms. This infant was several months of age and the child of the witness Laura Olson.

At the close of the case for the defendant, the plaintiff was called in rebuttal. She testified that she had never seen Mrs. Stofft or her daughter. She was then asked if she had ever been introduced to either of them; upon which, as we understand the record, she screamed and collapsed, and at

the direction of the trial judge was carried into his chambers; whereupon her counsel rested her case, and no further evidence was introduced on either side.

It is apparent that there is great contrariety in the evidence in regard to the condition of appellee's health prior to the accident and in regard to the effect of the accident upon her physical condition. On this subject, the Appellate Court said:

"There is a strong conflict in the evidence as to the state of her health and nervous condition for a number of years prior to the time of the accident, as well as since that time, but from a careful reading and consideration thereof, in the light of the arguments of counsel for the respective parties, we are of opinion that the clear preponderance of the evidence is that the appellee's ailments and condition of health since the accident were not altogether caused by the injuries she then received. * * * The evidence on behalf of appellant, as we think, shows by a clear preponderance that appellee's nervous condition and the state of her health are not by any means so serious as claimed by her, nor were they caused solely by the injuries she received."

It will be observed that the testimony of the witnesses Olson, Willis, Schram and Roberts, as above set forth, was wholly undenied. It is true that it seems that appellee was physically unable to go on with her testimony when she was testifying in rebuttal, but no application was made for a continuance or postponement of the cause until such time as she would be able to proceed with her testimony.

The first instruction given the jury on the part of appellee is as follows:

"The court instructs the jury that if they believe from the evidence that the defendant company was guilty of the negligence charged in the declaration and that the plaintiff has suffered injury by reason thereof, then in estimating the damages of the plaintiff in this case, you are to take into consideration the physical pain and suffering of the plaintiff,

if any has been shown by the evidence, the amount expended in her efforts to be cured, if any has been shown, the loss of time and value thereof, if any has been shown, the impairment of her ability to earn money in the future, if any has been shown, and the present physical condition of the plaintiff, as shown by the evidence, as well as the probability or improbability of her future recovery, as you may believe from the evidence, and from the evidence of these several matters and from your own knowledge of the common affairs of life arrive at a fair estimate of her damages, if any."

It is urged that this instruction is erroneous in that it fails to confine the jury to such damages as resulted from the accident. So far as this criticism is concerned, we think it is obviated by instructions 8, 14 and 16 given on the part of the defendant, within the rule followed by this court in *Wenona Coal Co.* v. *Holmquist,* 152 Ill. 581, and *Beidler* v. *King,* 209 id. 302. By each of these three instructions last mentioned, the jury were advised that she could only recover such damages as were the result of the accident complained of, and these instructions, when read in connection with said instruction No. 1, clearly advised the jury as to the law in that regard.

It is to be observed, however, that the first instruction informed the jury that in estimating the damages of the plaintiff in this case, they are to take into consideration "the present physical condition of the plaintiff, as shown by the evidence." If, as contended by the plaintiff, she was in a diseased and disabled condition, it was improper for the jury to take that condition into consideration unless that condition was shown by the evidence to have resulted from this accident. If such a condition was shown to exist, the jury were authorized by this instruction to consider it in estimating the damages, while under the law they should not have considered such condition unless the evidence went further and showed that such condition resulted from the accident, and while it is true that other instructions advised them that she

could recover no damages except such damages as resulted from the accident, still this instruction directed them, in estimating the amount of such damages, to consider her present physical condition, as shown by the evidence, from which the jury could only conclude that they were authorized to consider her present physical condition as resulting from the accident. Under the proof in this cause, there must be grave doubt whether such a conclusion is correct.

In cases sounding purely in damages, where the evidence is conflicting, and especially where the facts are calculated to touch upon the feelings and the sympathies the instructions to the jury should be clear, accurate and concise. *Chicago, Burlington and Quincy Railroad Co.* v. *VanPatten,* 64 Ill. 510; *West Chicago Street Railroad Co.* v. *Dougherty,* 170 id. 379.

In this case the plaintiff's physical condition, according to her contention, was deplorable. Her evidence had been emphasized by an ocular demonstration taking place in the presence of the jury, but as we have pointed out, it is extremely doubtful whether this condition was the result of the accident complained of. Under these circumstances we feel that this error in this instruction contributed materially to fixing the amount of the verdict at a figure which the Appellate Court considered was more than fifty per cent above a sum that would be adequate remuneration for the wrong done appellee.

During the cross-examination of the plaintiff, when she testified in making her case in chief, she stated that Miss Gee, the keeper of the boarding house where she lived, had been an invalid for three years, but that she, appellee, did not help take care of her and did not help lift her in and out of bed. She was then asked by counsel for appellant: "Didn't you carry her meals up to her sometimes?" Whereupon the following colloquy ensued:

The court: "She says she did not help tend her or care for her.

Counsel: "I am asking her now if she did not carry her meals from the basement.

The court: "I said she did answer that in the other question, and you can't ask it again.

Counsel: "I except to it.

The court: "That is the proper thing to do, and not try to evade my ruling."

We think the court was in error in saying that this question was included in the former. The witness was not apt to regard carrying meals up-stairs for the patient as being a part of the work of helping take care of her, especially at a time when it appeared to the witness to be against her interest to admit that she had helped take care of the sick woman. If she had engaged in carrying meals up to the patient from the basement, that fact was inconsistent with her direct testimony. Where, in a case of this character, the extent of the plaintiff's disabilities is in dispute, and especially where, as here, they are of such a character that the symptoms may be feigned, wide latitude should be allowed the counsel cross-examining the plaintiff. We think the objection made by the court was not well taken, and that the witness should have been permitted to answer the question. Afterwards counsel for appellant proved by another witness, Mrs. Willis, that appellee did perform this service for Miss Gee while she was sick, but this does not meet the difficulty. In the first place Mrs. Willis was in the employ of the appellant, and the jury may have discredited her testimony on that account. In the second place the defense was engaged in making an attack upon the truthfulness of appellee, and if this fact, inconsistent with her direct testimony, existed, appellant had the right to elicit that fact from her on cross-examination, that her testimony might thereby be weakened.

The judgments of the Appellate Court and the circuit court will be reversed and the cause will be remanded to the circuit court.                    *Reversed and remanded.*